Gants, Ralph D., J.
This action concerns the planned development by the defendant University Associates Limited Partnership (“University Associates”) of a project known as BioSquare Phase II (“the Project”) located in the existing BioSquare Research Park (“Research Park”) in the South End of Boston, near Boston Medical Center (“BMC”). The Project will consist of two buildings devoted to medical research and a large parking garage, specifically:
Building F, a seven-stoiy, 194,000-square-foot facility, that will contain the National Emerging Infectious Disease and Bio-Containment Laboratory (“the Biolab”), which will house biosafety laboratories studying various dangerous organisms that can cause infectious diseases in humans and other mammals. The Biolab will contain state-of-the-art Biosafety Level (“BSL”) 2, 3, and 4 laboratories, as well as space for associated research and administrative support;
Building G, an eleven-stoiy, 234,700-square-foot facility, that will be used for medical research, but will not house any BSL laboratories; and
an eight-level parking garage that will provide parking spaces for 1,400 vehicles.
What distinguishes this Project from various other projects that have built medical research facilities in a City renown for its medical research is the inclusion of a BSL-4 laboratory in the Biolab, where medical research will be conducted on the most dangerous disease-causing organisms and toxins known to mankind, including but not limited to the Ebola virus, smallpox, anthrax, and the Botulinum toxin. There is no higher level of security for a laboratory beyond BSL-4. Presently, there are only three BSL-4 laboratories in the United States: one operated by the Centers for Disease Control (“CDC”) in Atlanta, another operated by the U.S. Army Research Institute on Infectious Diseases at Fort Detrick in Frederick, Maryland, and a third operated by the Southwest Institute for Biomedical Research in San Antonio, Texas.
Background
To understand the allegations in the plaintffs’ Second Amended Complaint (“the Complaint”) and the four claims they have made, it is necessary first to understand the background that triggered this litigation.
In 1962, the Legislature enacted the so-called Roxbury Canal Statute, Stat. 1962, c. 762, which authorized the Massachusetts Department of Public Works to acquire through eminent domain whatever land it needed to improve the Roxbury Canal and other nearby waterways by providing for the discharge of storm water, surface drainage, and sewage overflow. When the waterway improvements were completed, this statute required the Commonwealth to convey to the Ciiy of Boston, without consideration, title to the land within the conduit system.
In 1965, the Boston Redevelopment Authority (“BRA”) adopted the South End Urban Renewal Plan. Under this Renewal Plan, future development of the site where the Research Park is now located was to focus on medical and institutional uses, rather than industrial uses. In 1966, the Legislature enlarged the amount of land within the scope of the Roxbuiy Canal Statute, directing the Commonwealth, upon completion of the conduit system, to convey to the City of Boston, without consideration, the area in the South End bounded by Massachusetts Avenue, Albany Street, Dover Street, and the John F. Fitzgerald Expressway (Interstate 93). The 1966 amendment further directed the City to then convey this land to the BRA for urban renewal in accordance with the Renewal Plan. Stat. 1966, c. 567.
In 1991, Boston University proposed, and the BRA approved, a Master Plan for the Planned Development of Area 41, which comprised BioSquare Phase I of the BioSquare Research Park, along with the associated changes in zoning. Phase I included the phased development of four research buildings, a 250-room hotel, and a parking lot located on roughly 8.5 acres of land on Albany Street. On December 12, 1991, after the BRA approved BioSquare Phase I, Boston University and the BRA entered into a Land Disposition Agreement. Under this Agreement, the BRA agreed to convey to Boston University the parcels of land that the BRA would obtain through the amended Roxbuiy Canal Statute. These parcels would comprise the site for the approved Phase I and the anticipated Phase II of the BioSquare Research Park.
On August 31, 1999, University Associates, the affiliate of Boston University that was developing the entire BioSquare Project, submitted to the Massachusetts Executive Office of Environmental Affairs (“EOEA”) its Environmental Notification Form (“ENF”), proposing to commence Phase II of the Research Park. At the time this ENF was submitted, Phase II did not include the Biolab. Rather, the Phase II described in the ENF contemplated two research buildings, one with 400,000 square feet of space and the other with 140,500 square feet, a parking garage, and a helipad.
On October 8, 1999, the Secretary of Environmental Affairs (“the Secretary”) issued a Certificate declaring that, under the Massachusetts Environmental Policy Act (“MEPA”), G.L.c. 30, §§61-62H, and Section 11.03 of the MEPA regulations (301 CMR 11.03), Phase II required the preparation of an Environmental Impact Report (“EIR”). As part of the Certificate, the Secretary defined the scope of the EIR, as required by 301 CMR 11.06 & 11.09. The Secretary directed Uni *326 versity Associates to explain the impact of the proposed Project on traffic, transit, parking, air quality, the historic resources of the nearby South End Landmark District, water use, and wastewater generation, and to summarize the measures University Associates would take to mitigate these foreseeable impacts. The Secretary also directed University Associates to analyze the “no-build alternative” to establish a baseline, and then analyze alternative site layouts to find a site layout that minimized the overall environmental impact.
In September 2003, before the Draft EIR had been submitted, the National Institutes of Health (“NIH”) accepted the grant proposal submitted jointly by Boston University and BMC to build and operate the Biolab. As a result, the Project was changed from two research buildings and a parking garage, to one research building, one Biolab, including a BSL-4 laboratory, and a parking garage. In view of this change in the nature of the Project, University Associates asked the Secretary whether she would require any changes in the scope of the EIR. The Assistant Secretary responded on June 30, 2003 that no change in scope was needed to consider the potential environmental risks posed by the proposed Biolab. The Assistant Secretary wrote:
I have reviewed the October 1999 scope in light of the subsequent evolution in project design. The scope remains relevant guidance for the analysis of environmental impacts from the revised project. No changes to the scope are necessary, and the proponent need not submit a Notice of Project Change prior to or concurrent with the filing the [sic] Draft EIR for the project. Of course, the Draft EIR should contain a complete description of the changes to the project since issuance of the scope, and a thorough analysis of potential environmental impacts from the currently proposed development, in accordance with Section 11.07 of the MEPA regulations as modified by the October 1999 scope.
EOEA Administrative Record (“AR”) at 34.[1] As a consequence of the June 30, 2003 letter, the scope of environmental impacts that University Associates was asked to consider in its Draft EIR continued to be limited to traffic, transit, parking, air quality, historic landmarks, water use, and wastewater generation; it was not required to consider any environmental or public health risks that may be posed by a BSL-4 laboratory.
The Draft EIR, furnished to the Secretary on September 30, 2003, reflected the scope set forth by the Secretary. Although noting that the proposed Project had been changed to include the Biolab, the Draft EIR did not discuss the work that would take place within the Biolab or even acknowledge that the Biolab would include a BSL-4 laboratory. Among the issues addressed in the Draft EIR were the buildings’ architectural compatibility with surrounding structures, as well as the Project’s impact on:
traffic and parking;
wind, shadows, and solar glare;
air quality;
noise;
solid and hazardous wastes;
groundwater;
historical resources; and
drinking water, sewer, and drainage.
In short, the Draft EIR was a traditional environmental impact report, which ignored any impact that may arise from the research on potentially deadly organisms and toxins anticipated to occur in the Biolab, including the BSL-4 laboratory.
On November 25, 2003, an organization known as ACE (Alternatives for Community & Environment) provided the Secretary with its comments on the Draft EIR. ACE wrote that the Draft EIR “contains one extraordinary omission. It fails to explain that the proponent intends to build a bioterrorism laboratory with a [BSL-4] component...” AR at 119. ACE argued:
The proponent’s omission of information about the [BSL-4] laboratory makes it impossible to determine the impacts of having that laboratory at the project site and to evaluate alternatives to the laboratory design and siting. Consequently, the omission is sufficient cause for the Secretary to determine, in accordance with 301 CMR 11.08(8), that the [Draft EIR] is inadequate and that the proponent must file a supplemental DEIR.
AR at 120. ACE concluded:
To draw an analogy, the [Draft EIR] that the proponent submitted is like a [Draft EIR] for a coal burning plant that discusses traffic patterns and foundation plantings while ignoring the operations of the plant itself and how those operations would affect the environment. In short, to assess the full environmental impact of the laboratory, the [Draft EIR] must describe and assess the work that will take place within the laboratory building, the impact of that work on the design of the project and the environment, potential mitigation measures, and alternatives.
ARat 121.
On December 1, 2003, the Secretary determined that the Draft EIR “adequately and properly complies” with MEPA and its implementing regulations. AR at 20. She did, however, determine that there were various issues that needed to be addressed in the Final EIR, including some regarding the Biolab. As to the Biolab, she wrote:
The Draft EIR does not include a detailed discussion of the potential environmental impacts of the biocontainment building. The Final EIR should in- *327 elude more detail on the proposed use of this building and any potential environmental impacts from the proposed use.
The Final EIR should address the concerns raised regarding the safety of the proposed biocontainment building. The Final EIR should discuss the design features that the biocontainment building will employ to enhance safety. The Final EIR should document how the facility would meet any applicable state and federal regulations regarding safety of the facility. The Final EIR should evaluate a “worst case” safety event involving the loss of the physical integrity of the containment systems. The Final EIR should also address safety considerations related to any transport of potentially hazardous biological agents to and from the biocontainment facility.
AR at 22. In addition, the Secretary required the Final EIR to respond to the “detailed comment letter submitted by [ACE].” AR at 23.
Meanwhile, on September 12, 2003, University Associates obtained the parcel of land for the parking garage, known as Parcel Q, and the adjoining Parcel Q-l through the culmination of a three-step process. On July 22, 2003, the Commonwealth, acting through the defendant Division of Capital Asset Management (“DCAM”), transferred Parcels Q and Q-l to the City of Boston. On August 21, 2003, the BRA executed an Order of Taking which took title to Parcel Q and Q-l from the City by eminent domain. On September 12, 2003, University Associates and the BRA executed a Third Amendment to the Land Disposition Agreement that provided for the conveyance of Parcels Q and Q-l from the BRA to University Associates, and executed the deed of Parcels Q and Q-l to University Associates. Under the Deed, University Associates was required to use the Parcels in conformity with the South End Urban Renewal Plan. The conveyance of the two Parcels was expressly made subject to the condition that not more than fifty percent of the land would be used for parking and the remaining fifty percent would remain as open space. Neither DCAM’s deed to the City nor BRA’s deed to University Associates included a condition that made the deed contingent upon compliance with MEPA. However, University Associates certified in the closing documents that it would “complete the MEPA process in accordance with MEPA regulations” before commencing construction on the parking garage. BRA AR at 397.
On July 30, 2004, University Associates filed the Final EIR with the Secretary. Section 5 of the Final EIR, entitled “Operational, Safely and Security Issues,” included the risk assessment required by the Secretary regarding the Biolab. The “worst-case safety event” it analyzed assumed that dry purified anthrax stored in a 15 milliliter test-tube was accidentally dropped in the BSL-4 laboratory, releasing 10 billion anthrax spores in aerosolized form within the laboratory. It also assumed that there would be a complete failure of all containment systems, resulting in viable anthrax spores being expelled from the building through the exhaust system over a period of roughly thirty minutes. The Final EIR found that “(t]he calculated worst-case exposure for any single individual from the scenario described above is .00024 spores,” and concluded that “the risk of public harm is so minute that it is negligible.” AR at 73-1167-1170.
The Final EIR also briefly discussed other potential risk scenarios, including the risk of staff acquiring infections within the laboratory, the release of contaminated air through the exhaust system, the escape of an infected animal, the shipment of biological material, the unauthorized removal of biological material from the containment area, and the threat of terrorism. As to the risk of infection among laboratory staff, the Final EIR declared that “(t]he numbers of laboratory-acquired infections are extremely low worldwide,” and none in the history of BSL-4 laboratories have caused any “secondary infection to surrounding workers” or any risk to the community. AR at 73-1172. The Final EIR also claimed that, with respect to the existing work in BSL-2 and BSL-3 laboratories at Boston University and BMC, “(t]he employee accident records from the last ten years have been thoroughly reviewed and it has been confirmed that no laboratory-acquired infections from research work in BSL-2 and BSL-3 laboratories have occurred.” Id.
The Final EIR was noticed for comment by the Secretary on August 11, 2004, September 8, 2004, and again on October 9, 2004. On November 15, 2004, after receiving numerous comments, including comments from the plaintiffs, the Secretary issued a Certificate stating that the Final EIR adequately and properly complied with MEPA. On December 6, 2004, the plaintiffs sent a notice of intent to sue, and then filed the instant action on January 12, 2005.
On December 14, 2004, the BRA Board of Directors voted to approve the authorization of the Project. Before the vote, the BRA had not made a finding describing the environmental impact, if any, of the Project or a finding that all feasible measures had been taken to avoid or minimize its environmental impact, as required by G.L.c. 30, §61. The BRA made such a finding on June 30, 2005, more than six months after its authorization.
On April 6, 2005, DCAM notified University Associates that it had not issued its finding under G.L.c. 30, §61 and did not, therefore, consider the September 12, 2003 land transfer to be final. DCAM issued its G.L.c. 30, §61 finding on June 10, 2005, which reconfirmed the transfer of Parcels Q and Q-l, and made no changes in that transfer.
History of the Litigation
The plaintiffs, ten identified residents of Boston (“the plaintiffs” or “the Residents”), contend that the Secretary erred on various grounds in finding that the *328 Final EIR adequately and properly complied with MEPA. Specifically, the Residents contend that the Final EIR analyzed only a single worst-case scenario, regarding a hypothetical release of anthrax, in which the pathogen is transmitted only by the inhalation of spores, and did not consider any scenario involving the spread of a contagious disease that is transmitted human-to-human, such as the Ebola virus or smallpox. They also contend that, even though the Project will house a Biolab that will test dangerous organisms capable of transmitting deadly diseases, the Final EIR did not seriously examine alternative locations outside the proposed site in a densely populated area in the South End.
The plaintiffs also observed that, although University Associates in the Final EIR had represented that it had “thoroughly reviewed” the “employee accident records from the last ten years” at the BSL-2 and BSL-3 facilities operated by Boston University and the BMC, and “confirmed that no laboratory-acquired infections from research work in BSL-2 and BSL-3 laboratories have occurred,” it emerged in January 2005 that three Boston University scientists had, in fact, been exposed to tularemia in a BSL-2 laboratory in 2004 (two in May 2004 and a third in September 2004) and had become ill with fever, cough, and headache. None of these exposures to tularemia had been reported to the Massachusetts Department of Public Health until November 9, 2004, shortly before the Secretary issued the Final Certification, and none were reported to the Secretary’s MEPA office until after January 14, 2005. Consequently, the Final EIR Certification was issued without the Secretary’s knowledge of these tularemia exposures and of Boston University’s failure to timely report them.
Count I of the Complaint alleges that University Associates, as the proponent of the Project, withheld and concealed from the Secretary the information regarding the tularemia incidents. The relief sought on this Count is the withdrawal of the Final EIR until these incidents are fully investigated and disclosed, and the filing of a Supplemental Final EIR addressing the tularemia exposures and the failures of reporting.
Count II more broadly challenges the adequacy of the Final EIR and contends that it does not comply with the requirements of MEPA because of the purported inadequacy of the worst-case scenario and its failure to consider alternative locations for the Biolab.
Count III challenges the transfer of Parcels Q and Q -1 by DCAM and the BRA, contending that title could not be transferred until University Associates had completed the MEPA process. Its central allegations are that DCAM and the BRA violated G.L.c. 30, §61 by transferring Parcels Q and Q-1 without having made the findings required by that statute.
Count IV challenges the G.L.c. 30, §61 findings belatedly made by DCAM and the BRA, contending that they were inadequate because they failed to consider the land transfer anew, and failed to consider additional information that had become available, including the reports regarding the tularemia incidents.
The defendants earlier filed a motion to dismiss Counts I and III of the Complaint. In a Memorandum and Order issued on September 14, 2005, Judge Nonnie Burnes dismissed Count I, declaring:
Here, the Secretary was made aware of the tularemia incident, required [University Associates] to provide an explanation for the incident, and determined that the new information had not been knowingly concealed, was not material to the Project, and did not require a Notice of Project Change or other re-opening of the MEPA process. Thus the Residents have already received the relief they seek in Count I: consideration by the Secretary of the tularemia incident under G.L.c. 30, §62H.
Memorandum and Order at 11. Judge Burnes added, “Where a parly has already obtained all the relief it seeks from the court, there is no longer a live issue for adjudication, and the issue is moot.” Id.
Judge Burnes also dismissed those aspects of Count III that:
complained about the failure of DCAM to issue findings under G.L.c. 30, §61, concluding that this aspect of the claim became moot when DCAM belatedly issued its Section 61 findings;
complained about University Associates’ failure to submit a Notice of Project Change when the Project was revised to include the BioSafety Level 4 laboratory, finding that the Secretary had determined, after consultation with University Associates, that no Notice of Project Change was required, and that such a determination is wholly discretionary and not subject to judicial review; and
complained about “BRA’s modification of the South End Urban Renewal Plan and other actions taken [by the BRA] with respect to the Project,” finding that the Residents lacked standing to bring these challenges under MEPA.
Id. at 13-15. She did not dismiss the Residents’ claim in Count III against DCAM for transferring title to Parcels Q and Q-1 before issuing its Section 61 findings. Id. at 14 n.6.
Judge Burnes also denied the Residents’ motion for partial summary judgment on this surviving aspect of Count III, although she noted that DCAM conceded that the transfer of Parcels Q and Q-l violated MEPA because DCAM transferred title before it had made its Section 61 findings and before the Secretary issued her Certificate regarding the Final EIR. Memorandum of Decision and Order on Plaintiffs Motion for Partial Summary Judgment, September 14, 2005 at 7-8. Judge Burnes rejected the Residents’ proposed remedy — that the DCAM transfer of title be deemed void— and concluded that “[t]he prudent course is to defer *329 determination of the appropriate remedy until resolution of Count II of the Amended Complaint, which seeks review on the adequacy of the [Final EIR].” Id. at 8.
The Residents have now moved for judgment on the pleadings to resolve the remaining claims.
MEPA and the MEPA Regulations
Before resolving the remaining claims, it is necessary first to understand the pertinent provisions of MEPA and the implementing MEPA regulations.
Under G.L.c. 30, §61:
All agencies ... of the commonwealth shall review, evaluate, and determine the impact on the natural environment of all works, projects or activities conducted by them and shall use all practicable means and measures to minimize damage to the environment. Unless a clear contrary intent is manifested, all statutes shall be interpreted and administered so as to minimize and prevent damage to the environment. Any determination made by an agency of the commonwealth shall include a finding describing the environmental impact, if any, of the project and a finding that all feasible measures have been taken to avoid or minimize said impact.
G.L.c. 30, §61. “Damage to the environment” is defined as “any [significant][2] destruction, damage or impairment, actual or probable, to any of the natural resources of the commonwealth and shall include but not be limited to air pollution, water pollution, improper sewage disposal, pesticide pollution, excessive noise, . . . destruction of. . . parks or historic districts or sites.” Id. An agency is defined as “an agency, department, board, commission or authority of the commonwealth, and any authority of any political subdivision which is specifically created as an authority under special or general law.” G.L.c. 30, §62.[3] A “project” that requires what has become known as a Section 61 determination includes any “work, project, or activity either directly undertaken by an agency, or if undertaken by a [private] person, which seeks the provision of financial assistance by any agency, or required the issuance of a permit by an agency . . .” Id.
When a project is not directly undertaken by an agency but requires a permit or financial assistance from an agency, the EIR is prepared by the entity seeking the permit or financial assistance — here, University Associates. See G.L.c. 30, §62B. Before preparing the EIR, the proponent of the project must first provide the Secretary with the ENF notifying her of the nature of the proposed project and the agencies from whom a permit or financial assistance is sought so that the Secretary may issue a certificate stating whether an EIR is required. G.L.c. 30, §62A.
If [an EIR] is required, the Secretary with the cooperation of [the proponent] and agency shall... limit the scope of the report to those issues which by the nature and location of the project are likely to cause damage to the environment. The secretary shall determine the form, content, level of detail, and alternatives required for the report. In the case of a permit application to any agency from a private person for a project for which financial assistance is not sought the scope of said report and alternatives considered therein shall be limited to that part of the project which is within the subject matter jurisdiction of the permit. Any finding required by [Section 61] shall be limited to those matters which are within the scope of the environmental impact report, if any, required by this section.
Id. Essentially, when the EIR is required only to provide guidance to an agency as to whether or not to grant a permit for a project, the scope of the EIR is limited to those matters that reasonably may be considered by the permit-granting agency and made part of its Section 61 findings. When, however, any agency of the Commonwealth is providing financial assistance for the project, the EIR may be broader in scope because the agency may wish to consider the entirety of damage to the environment likely caused by the proposed project in determining whether to provide the requested funding.[4] Here, University Associates needed to obtain permits from various agencies (as defined under G.L.c. 30, §61), including DCAM and the BRA, and was receiving financial assistance from the Commonwealth. The Secretary, therefore, in issuing the ENF Certificate on October 8, 1999 noted that “MEPA jurisdiction therefore extends to all aspects of the project that may have significant environmental impacts,” meaning that the scope of the EIR was not limited to the subject matter jurisdiction of the permits required. AR at 14.
While the Secretary limits the scope of the EIR, G.L.c. 30, §62B sets forth its general content: “[a]n environmental impact report shall contain statements describing the nature and extent of the proposed project and its environmental impact; all measures being utilized to minimize environmental damage; any adverse short-term and long-term environmental consequences which cannot be avoided should the project be undertaken; and reasonable alternatives to the proposed project and their environmental consequences.” G.L.c. 30, §62B.
The statutory obligation of the Secretary is to issue a statement within seven days after the close of the public and agency review period “indicating whether or not in [her] judgment said report adequately and properly complies with the provisions of [G.L.c. 30, §§62-62H] inclusive . . . The approval or disapproval of said secretary of any such report shall not be required.” G.L.c. 30, §62C. As noted earlier, Count II of the plaintiffs’ Complaint challenges the Secretary’s determination that the Final EIR “adequately and properly complies” with the MEPA statutory requirements. Since G.L.c. 30, §62C recognizes that the *330 Secretary must exercise her judgment in determining the adequacy of the Final EIR, this Court’s review of her determination is limited to “the arbitrary or capricious test.” Sierra Club v. Commissioner of Dept. of Environmental Management, 439 Mass. 738, 748 (2003). Count IV challenges the Section 61 findings made by DCAM and the BRA after the transfer of Parcels Q and Q-1 to University Associates for the construction of the new garage. The Court’s review of these findings is also limited to the arbitrary or capricious test. Id.
DISCUSSION
As is clear from the MEPA statutes and regulations, the role of the Secretary in MEPA is not to decide whether the benefits of a project overcome its anticipated environmental impact, or whether all feasible measures have been taken to avoid or minimize the project’s environmental impact. That role is performed by the agency deciding whether to provide financial assistance to the project or to provide a permit allowing it to proceed. Compare G.L.c. 30, §61 with G.L.c. 30, §62C. Instead, the Secretary’s role, as she aptly described it in her certification of the Final EIR, “is to ensure that a project proponent studies feasible alternatives to a proposed project; fully discloses environmental impacts of a proposed project; and incorporates all feasible means to avoid, minimize, or mitigate Damage to the Environment as defined by the MEPA statute.” AR at 26. The plaintiffs contend that, as to at least two issues, the Final EIR fails adequately and properly to accomplish those objectives, and that the Secretary was arbitrary and capricious in finding that it had.
First, the plaintiffs contend that the “worst case safety event” of an anthrax spill within the laboratory set forth in the Final EIR was wholly inadequate because any reasonable “worst case safety event” would plainly involve the release of a contagious organism that could easily spread among humans, such as smallpox or the Ebola virus. Second, they contend that the Final EIR is fatally flawed because it fails to consider whether the environmental risks posed by the proposed BSL-4 laboratory in the Biolab would be significantly diminished if the BSL-4 laboratory were located in a suburban or rural location, rather than a densely populated urban area in the South End of Boston.
1. The Standard of Review
In considering the. plaintiffs’ challenges to the Secretary’s certification of the Final EIR, this Court is mindful that the standard of review established by the Supreme Judicial Court in these cases is the arbitrary or capricious standard — whether the Secretary’s exercise of her discretion lacked a rational basis. Sierra Club, 439 Mass, at 748. As explained in Sierra Club, “The process by which the information is gathered, identified, and applied to the statutory standards under MEPA must be logical, and not arbitrary or capricious.” Id. at 749. In determining whether the Secretary lacked a rational basis in her exercise of discretion, this Court is also mindful that appropriate deference must be given to her anticipated expertise concerning the environment. See Colby v. Metropolitan Prop. & Cos. Ins. Co., 420 Mass. 799, 806 (1995) (“[T]he commissioner’s interpretation of the relevant statutes, although not controlling, is entitled to deference”). “These principles of deference, however, are not principles of abdication.” Nuclear Metals, Inc. v. Low-Level Radioactive Waste Mgmt. Bd., 421 Mass. 196, 211 (1995). If the Secretary’s exercise of discretion is illogical and without rational basis, and cannot reasonably be reconciled with the governing legislation, her decision must be rejected. See id.; see also Colby v. Metropolitan Prop. & Cas. Ins. Co., 420 Mass. at 806.
In considering these challenges, this Court is also mindful that the Biolab, with its BSL-4 laboratory, is no ordinary project, and the potential risks it poses to the environment and public health are extraordinary and, potentially, catastrophic. While many BSL-2 and BSL-3 laboratories are already located in Boston and Cambridge, the Biolab will bring the first BSL-4 laboratory to Boston. To be blunt, this project will bring the smallpox and Ebola virus to Boston — organisms which, one sincerely hopes, are not currently found in this city. While these viruses pose minimal risk of harm if confined to the BSL-4 laboratory in accordance with the rigorous safely standards that govern a BSL-4 laboratory, they can commence a deadly epidemic if any leave that laboratory, whether through;
the infection of a laboratory staff member arising from human error, or homicidal or suicidal intent,
the unauthorized removal of these viruses from the laboratory by a staff member bent on selling them, or extorting money by threatening to release them, or doing harm to another,
the hijacking of a viral shipment, or
an act of terrorism.
One prays that these risks are small but, in an imperfect world, these risks inevitably exist and they must be addressed, both by taking all reasonable steps to reduce the likelihood that they could occur and to limit the potentially catastrophic harm that could result if they were to occur. The potential of catastrophic environmental harm arising from a project does not change the standard of review of this court, but it does affect the amount of information that a court reasonably may expect to be contained in the Final EIR for the Secretary rationally to conclude that the EIR has adequately and properly accomplished the objectives the Secretary herself set forth — "to ensure that a project proponent studies feasible alternatives to a proposed project; fully discloses environmental impacts of a proposed project; and incorporates all feasible means to avoid, minimize, or mitigate Damage to the Environment as defined by the MEPA statute." AR at 26.
*331 2. Was the “worst case safety event” of an anthrax spill within the laboratory set forth in the Final EIR wholly inadequate because any reasonable “worst case safety event” would plainly involve the release of a contagious organism that can be easily spread among humans?
The Secretary initially failed to recognize the potentially catastrophic risk posed by a BSL-4 laboratory when, on June 30, 2003, she determined that no change in project scope was needed for the Draft EIR even though the project proposal had been changed to include a BSL-4 laboratory. Since the scope of the EIR should include all issues which, by the nature of the project, are likely, directly or indirectly, to cause Damage to the Environment (as that term is defined by G.L.c. 30, §61), see G.L.c. 30, §62A, 301 CMR 11.09(b), the Secretary’s determination that no change in project scope was needed was implicitly a finding that the BSL-4 laboratory posed no risk of direct or indirect damage to the environment. Since the Draft EIR was limited by the scope set by the Secretary, the Draft EIR prepared by University Associates made no mention of the BSL-4 laboratory and included no discussion of its environmental risks. As a result, the Secretary did not have the benefit of University Associates’ analysis of those risks or of any public comment on its analysis when she considered the Draft EIR.
Under 301 CMR 11.08(b), the Secretary has three choices after review of the Draft EIR:
1. She can determine that the Draft EIR is inadequate and require the proponent to file a Supplemental Draft EIR; 301 CMR 11.08(b)(3);
2. She can determine that “no substantive issues remain to be addressed” and either (a) publish notice that the Draft EIR shall be reviewed as a Final EIR or (b) require the proponent to file responses to comments on the Draft EIR and proposed Section 61 findings, and publish notice that the responses and findings will be reviewed as a Final EIR; 301 CMR 11.08(b)(2); or
3. She can “determine that the draft EIR is adequate, even if certain aspects of the Project or issues require additional description or analysis in a final EIR, provided that the Secretary finds that the draft is generally responsive to the requirements of 301 CMR 11.07 and the Scope.” 301 CMR 11.08(b)(1).
By selecting the third choice, the Secretary implicitly recognized that substantive issues concerning the BSL-4 laboratory that were outside the scope of the Draft EIR needed to be addressed in the Final EIR.[5]
Unfortunately, because these substantive issues had not been addressed at all in the Draft EIR, the Secretary was perhaps less able than she otherwise would have been to define precisely how they should be addressed in the Final EIR. Instead of providing specific guidance as to which issues should be addressed, the Secretary simply asked for “more detail on the proposed use of this building and any potential environmental impacts from the proposed use.” AR at 22. The Secretary specifically directed that the Final EIR address only four issues: (1) “discuss the design features that the biocontainment building will employ to enhance safety,” (2) “document how the facility would meet any applicable state and federal regulations regarding safety of the facility,” (3) “evaluate a ‘worst case’ safety event involving the loss of the physical integrity of the containment systems,” and (4) “address safety considerations related to any transport of potentially hazardous biological agents to and from the biocontainment facility.” Id. In providing this guidance, the Secretary failed to focus on the difference in risk posed by pathogens which can be spread through the air and may be fatal if inhaled but are not contagious (such as anthrax or, more precisely, its infectious agent — Bacillus anthracis), versus those pathogens which are infectious and can be spread through person-to-person contact, such as:
smallpox, which can be spread by “direct and fairly prolonged face-to-face contact” or “direct contact with infected bodily fluids or contaminated objects, such as bedding or clothing,” see AR at 73-1391;
Severe Acute Respiratory Syndrome, known as SARS, which can be spread “through respiratory droplets,” see ARat 73-1390; or
Ebola hemorrhagic fever, which can be spread “through direct contact with infected blood secretions, organs or semen.” See AR at 1395.
Since the “worst case safety event” was limited to “the loss of the physical integrity of the containment systems,” University Associates reasonably understood that the focus should be on pathogens that can be spread by airborne inhalation if the ventilation containment system at the BSL-4 laboratory were to fail, and therefore provided the scenario involving the dropped vial of purified anthrax inside the laboratory.
There were two substantial failures in the risk assessment that arose from limiting the “worst case safety event” to a failure of the ventilation containment system. First, no “worst case safety event” was analyzed regarding any release of a contagious disease from the laboratory, even though such a release potentially may occur, not from a complete failure of the ventilation containment system, but simply from a laboratory staff member becoming infected with the infectious pathogen. The risk of such an infection, while small, cannot be characterized as non-existent.
Appendix 4 of the Final EIR contains two reports prepared by Karl M. Johnson, M.D. on October 15, 2003. The first, entitled “Biosafety at National Institute of Allergy and Infectious Diseases: 1982-2003,” examines the number of accidental exposures to infectious agents during this period at BSL-2 and BSL-3 laboratories operated by the National Institute in three loca *332 tions — -Bethesda and Rockville, Maryland, and Hamilton, Montana. Dr. Johnson found one clinical infection, four silent infections, and 24 other accidents which did not lead to infections in more than three million hours of working with these organisms. AR at 73-1404-1405. While Dr. Johnson justly concludes that the safety record for these laboratories is “outstanding” and specifically notes that “[n]o agent has escaped from any laboratory to cause infection in adjacent civilian communities,” his report demonstrates that there is a small, but significant, risk of infections and accidental exposures over the life of these facilities. Dr. Johnson’s second report, entitled “Biosafety at BSL-4: More than 20 Years Experience at Three Major Facilities,” examined the number of laboratory accidents at three BSL-4 laboratories — Fort Detrick, Maryland, the CDC laboratory in Atlanta, and a laboratory in Johannesburg, South Africa operated by the South African National Institute for Communicable Diseases. Dr. Johnson found that, at Fort Detrick, in the early years of the laboratory, an unspecified number of “invasive accidents resulted in treatment with human plasma containing specific antibodies to virus in question, as well as confinement in an isolation suite in one building . . .” AR at 73-1410. Two invasive accidents were of the greatest concern, one in which a staff member’s finger was accidentally punctured with a needle on a syringe loaded with the Lassa virus and another in which a bone fragment of a monkey infected with the Junin virus punctured a staff member’s finger. Fortunately, no infection occurred in either incident. Id. At the CDC facility, various laboratory accidents were identified, none of which resulted in infection. Among these accidents were: a rodent infected with Hantavirus bit a staff member; a needle pricked a worker who was setting up an inoculation with a mouse-adapted Ebola virus; and “multiple events over the years of outer gloves or suits developing tears or holes detected during work.” Id. at 73-1411. At the Johannesburg laboratory, Dr. Johnson learned of a bat bite through double gloves, which did not produce an infection, and “multiple other accidents,” during which “(t]hose exposed are monitored closely for 21 days, during which time they are not permitted to leave town — as are all employees after their last day of work inside BSL-4 space.” No infections were reported from these accidents. Id. at 73-1412. Here, too, Dr. Johnson could justly conclude that no clinical infections had occurred at these facilities despite nearly half a million hours of working with these organisms, and that no infectious agent had escaped into a neighboring community. Id. at 73-1413. However, Dr. Johnson does not negate the possibility of infection to either laboratory workers or the outside community. Rather, he states, “The zero numerator of infections in these three laboratories and the huge denominator of exposure hours make it impossible to provide a number for ‘risk of infection’ to either laboratory workers or outside communities. Nevertheless, that number must be small.” Id.
Dr. Johnson did not identify any instance of intentional infection by a laboratory employee, such as a laboratory worker who intended to infect himself or a co-worker, or of the intentional removal of a pathogen from the laboratory to commit extortion or provide to a terrorist organization. This risk, too, is surely small but, equally surely, the risk must be recognized to exist. To be sure, the Final EIR observes that background and security checks will be conducted on all employees before being assigned to the Biolab. However, all CIA and FBI agents are subject to background and security checks as well, perhaps more intensive than any contemplated by NIH, but there are at least two documented instances in the past two decades of a CIA agent (Aldrich Ames) and FBI agent (Robert Hanssen) each with compartmentalized top secret clearances, providing classified secrets to the then-Soviet Union that risked (and probably cost) the lives of various confidential informants. If the CIA and FBI, with their expertise in background checks, cannot ensure that none of their carefully selected agents will betray their trust, there is no good reason to assume that University Associates need not fear this risk.
Ironically, on November 12, 2004, two days before the Secretary certified the Final EIR that did not include any “worst case” scenario involving a laboratory accident involving an infectious disease-causing organism, BMC received confirmation that:
three of its laboratory scientists had fallen ill while working with tularemia at a BSL-2 laboratory (two in May 2004 and a third in September 2004),[6]
that they had not initially been diagnosed with tularemia and were not treated for it,
that the scientists had believed they had been working with a vaccine strain of tularemia that was not considered to cause illness but had, in fact, been working with a more virulent strain that had been mixed in with the vaccine strain,
that their exposure and illness had not been reported to the Boston Public Health Commission until November 10, 2004, and
that, on November 12, 2004, their blood tests confirmed that they had tested positive for tularemia.
Superseding Supplemental AR at 3-5. This Court recognizes that the Secretary did not have this information when she certified the Final EIR and therefore reasonably could not have considered it. The tardy disclosure of this information is raised here only because it poignantly demonstrates a genuine risk that was foreseeable to anyone, including the Secretary, at the time she did certify the Final EIR — the risk of an accidental or malevolent infection with a communicable disease by a laboratory worker — whose potential consequences were never subjected to a “worst case” scenario analysis.[7]
*333 In short, the Final EIR demonstrated that there was a small, but significant, risk of a laboratory accident that could result in the infection of a laboratory worker with a contagious disease, but the Final EIR did not contain any “worst case” scenario that explored the potential consequences of such an accident. Nor did it contain any “worst case” scenario that explored the potential consequences of the release of a contagious pathogen arising from a suicidal, criminal, or terrorist act.[8]
The second substantial failure in the risk assessment that arose from limiting the “worst case safety event” to a failure of the ventilation containment system was that the “worst case” identified proved to pose a “negligible” risk of public harm. AR at 73-1169. In other words, the “worst case” scenario in the Final EIR Report was not, by any reasonable standard, the true “worst case” scenario because it assumed a risk that turned out to pose no real threat to the community. This would not pose a problem if there were truly no “worst case” other than the scenario hypothesized but, as has been discussed, it is plain that there were far more serious “worst case” scenarios that were never identified or considered.
These two substantial failures in risk assessment meant that the Final EIR failed to provide the agencies who were relying on it to issue their Section 61 findings with any information setting forth a true “worst case” scenario involving the accidental or malevolent release of a contagious pathogen. Any reasonable evaluation of a risk requires an understanding of the probability of the risk occurring over the life of the Project and the magnitude of harm that could arise if it were to occur. From the Final EIR, the agencies could evaluate the probability of an accidental or malevolent release of a contagious pathogen and recognize it to be small, but the Final EIR did not provide any guidance as to the magnitude of harm that could result if that small risk were sadly to occur. Since, as noted earlier, “[a]ny finding required by [Section 61] shall be limited to those matters which are within the scope of the environmental impact report,” G.L.c. 30, §62A, the absence of this information regarding the potential environmental impact meant that it could not be addressed in the Section 61 finding. Even worse, the Final EIR permitted the agencies to act upon the belief that even the “worst case safety event” posed only a negligible risk of public harm. Therefore, the absence of any “worst case” scenario involving the accidental or malevolent release of a contagious disease-causing organism meant that the Final EIR failed to inform the relevant public agencies making financial and permitting decisions regarding the Project of the potential for catastrophic harm posed by the Project. To be sure, the small risk of even catastrophic harm does not suggest that any public agency should kill the Project, especially when, as here, the Project itself will conduct research designed to combat bioterrorism. But it is necessary that a public agency considering such a Project come to grips with the true risks posed by the Project and not be lulled by the Final EIR into ignoring the small possibility of enormous public harm.
3.Was the Final EIR fatally flawed because it failed to consider whether the environmental risks posed by the proposed BSL-4 laboratory in the Biolab would be significantly diminished if the BSL-4 laboratory were located in a suburban or rural location, rather than a densely populated urban area in the South End of Boston?
As noted earlier, G.L.c. 30, §62B provides that an EIR “shall contain statements describing . . . reasonable alternatives to the proposed project and their environmental consequences.” While the Secretary “shall determine the . . . alternatives required for the [EIR],” G.L.c. 30, §62A, the MEPA regulations provide that the scope established by the Secretary must ensure that “the draft and final EIRs shall present a complete and definitive description and analysis of the Project and its alternatives, and assessment of its potential environmental impacts and mitigation measures sufficient to allow a Participating Agency to fulfil its obligations in accordance with M.G.L.c. 30, §61 and 301 CMR 11.12(5).” 301 CMR 11.07(4). The MEPA regulations also set forth what is required for the description and analysis of “alternatives to the Project,” which must include:
1. all feasible alternatives, including but not limited to those indicated in the Scope;
2. the alternative of not undertaking the Project (i.e. the no-build alternative) for the purpose of establishing a future baseline in relation to which the Project and its alternatives can be described and analyzed and its potential environmental impacts and mitigation measures can be assessed;
3. an analysis of the feasible alternatives in light of the objectives of the Proponent and the mission of any Participating Agency . . . ;
4. an analysis of the principal differences among the feasible alternatives under consideration, particularly regarding potential environmental impacts; [and]
5. a brief discussion of any alternatives no longer under consideration including the reasons for no longer considering these alternatives.
301 CMR 11.07(f).
What is not clear from the statute or the regulations, or from the case law, is whether the feasible alternatives that must be analyzed are limited to feasible alternatives within the proposed site of the Project or include feasible alternatives at different site locations. The plaintiffs contend that the EIR should have analyzed at least one alternative site that was less urban than the proposed South End site and compared the potential environmental impact be *334 tween these two sites. University Associates contends that consideration of alternate sites is not among the “feasible alternatives” contemplated by MEPA, and falls outside the appropriate scope of an EIR.
In the absence of clear guidance from the language of the statute or regulations, or from controlling case law, this Court must look to the purpose and spirit of MEPA to resolve this question of interpretation. It is plain from both the MEPA statute and regulations that an alternative need not be considered if it is not “reasonable” or “feasible” or “available.” See G.L.c. 30, §62B (“reasonable alternatives”); 301 CMR 11.07(6) (“EIR shall reflect . . . the availability of reasonable alternatives”); 301 CMR 11.07(f) (“all feasible alternatives”). It is also plain from both the MEPA statute and the regulations that the purpose of analyzing feasible alternatives is to determine whether there is a feasible alternative to the project proposal that will accomplish the objectives of the proponent and satisfy the needs of the project with less potential environmental impact. See G.L.c. 30, §62B (“reasonable alternatives to the proposed project and their environmental consequences"); 301 CMR 11.07(6) (“the availability of reasonable alternatives and methods to avoid or minimize potential environmental impacts”); 301 CMR 11.07(f) (calling for analysis of principal differences among feasible alternatives, “particularly regarding potential environmental impacts”).
Applying these considerations, in the vast majorily of projects subject to MEPA review, the only feasible alternatives will be within the proposed site, on the property owned or leased by the proponent. It would make no sense for the Secretary routinely to require a developer who is proposing to build an ordinary shopping center on property he owns or leases to identify other sites where he could build a shopping center that might, for instance, produce less traffic congestion. For such projects, the feasible alternatives would be limited to different designs of the shopping center that, for instance, would move the shopping center entrance to a side road. Indeed, when the MEPA EIR is required only because permit applications must be granted by an agency and not because of any governmental financial assistance, G.L.c. 30, §62A specifically limits the alternatives considered to those “within the subject matter jurisdiction of the permit.” G.L.c. 30, §62A.
However, when the project potentially may produce a severe environmental impact, it may be reasonable for the Secretary to require that the EIR analyze feasible alternative sites for the project to determine whether the potential environmental impact would be significantly less severe at a different site. It may be especially reasonable to consider alternative sites when the project proponent seeks governmental financial assistance and the agency must determine whether to provide that assistance. Conversely, when the environmental impact might be potentially catastrophic, it might be unreasonable for the Secretary not to require the analysis of feasible alternative sites when there is reason to believe that the environmental impact may be significantly less at an alternative site.
While University Associates contends that it is never appropriate to require the analysis of alternative sites in a Final EIR, the Secretary recognizes that there are projects in which it is appropriate to do so, and she has so directed in establishing the scope of various EIRs. For instance, in the Secretary’s Certificate regarding the ENF for the proposed Cape Wind Project, which would place 170 wind turbine generators over 26 square miles of a sub-tidal area in Nantucket Sound, the Secretary required the EIR to discuss alternative locations, noting “these may be located in mountainous areas of western Massachusetts, elsewhere on or off Cape Cod.” Cape Wind Project ENF Certificate, April 22, 2002 at 7. In the Secretary’s Certificate regarding the ENF for the proposed construction of a deepwater port in Massachusetts Bay to dock liquified natural gas carriers, the Secretary required the EIR to analyze “alternate port locations, pipeline routes, and points of connection to the existing gas distribution system.” Northeast Gateway Energy Project ENF Certificate, May 16, 2005 at 7. Similarly, in finding that a Supplemental Draft EIR on the Weaver’s Cove liquified natural gas project did not adequately and properly comply with MEPA, the Secretary directed that the Second Supplemental Draft EIR “must evaluate any alternative sites deemed necessary by [Coastal Zone Management] to establish coastal dependency and to otherwise comply with Coastal Energy Policy #1 ... in order to fully evaluate the environmental and safety impacts of locating an LNG facility at alternative sites.” Weaver’s Cove LNG Project, Certificate on the Supplemental Draft EIR, December 17, 2004 at 5-6.
The proposed Biolab, as discussed earlier, plainly poses a small risk of potentially catastrophic harm to the environment and public health if one considers the admittedly small risk of an accidental or malevolent release of a contagious pathogen. Equally plainly, there is the possibility that the extent of the contagion that may result from such a release may be different if the BSL-4 were located in a less urban location. For instance, while an infected laboratory worker may go home from the Biolab in the South End by bus, subway, or train, raising the immediate risk of infecting hundreds of fellow riders, that worker may have no realistic choice but to go home by car if the Biolab were located in a suburban or rural location. If the “worst case” scenario were truly the dropping of a vial of anthrax within the Biolab, there may be no need to consider alternative sites because the risk that anyone would become ill by inhaling anthrax in even a densely populated community is negligible. But when one recognizes that the true “worst case” scenario involves the risk of contagion, not inhalation, then the density of the population surrounding the Biolab may have greater consequences for the extent of the harm aris *335 ing from that “worst case.” Therefore, the failure of the Final EIR to consider any “worst case" scenario involving the risk of contagion is interwoven with its failure to consider whether locating the Biolab, or at least the BSL-4 laboratoiy, in an alternative feasible, but less urban, location would significantly reduce the potential magnitude of catastrophic harm that may arise from the inadvertent release of a contagious pathogen from the facility.
The Secretary, in certifying the Draft EIR, wrote that the Final EIR should respond to the detailed comment letter submitted by ACE, and that letter specifically asked that the EIR analyze alternative locations for the BSL-4 laboratory. See AR 23 & 120-121. Yet, the Final EIR never considered any alternative feasible location. Indeed, University Associates’ only discussion of an alternative location in the Final EIR came in response to a letter, not from ACE, but from the Worcester Square Area Neighborhood Association, in which University Associates wrote that locating the Biolab in a rural area “would fail to take advantage of the essential benefit of shared intellectual and capital resources achieved by locating the facility within the City of Boston at the Boston University Medical Center Campus.” AR at 1213.
In short, not only did the Final EIR fail to analyze any “worst case” scenario that involved the risk of contagion arising from the accidental or malevolent release of a pathogen, but it also failed to analyze whether that “worst case” scenario would be materially less catastrophic if the Biolab were located in a feasible alternative location in a less densely populated area. In other words, the Final EIR fails to answer two questions that virtually anyone learning of the proposed Biolab reasonably would ask:
i. What is the worst that could happen if a laboratoiy worker were infected with a contagious pathogen he was studying?
ii. Would the impact be significantly less if the Biolab were located outside of a city?[9]
4. Did the Secretary’s exercise of her discretion in certifying the Final EIR lack a rational basis?
This Court finds that, by certifying that the Final EIR adequately and properly complied with MEPA and the MEPA regulations even though it failed even to consider these two questions, the Secretary failed to accomplish the purpose of MEPA review that she acknowledged in that certification — "to ensure that a project proponent studies feasible alternatives to a proposed project; fully discloses environmental impacts of a proposed project; and incorporates all feasible means to avoid, minimize, or mitigate Damage to the Environment as defined by the MEPA statute." AR at 26. The standard of review of the Secretaiy’s certification, however, requires more than that in order to vacate her certification and remand it to the Secretary — it requires a judicial finding that her certification was arbitrary or capricious, that is, that it lacked a rational basis.
This Court finds that the Secretaiy’s certification of the Final EIR lacked the necessary rational basis. The Biolab, with its BSL-4 laboratory, poses the potential for extraordinaiy societal benefit and, if enormous care is not taken, extraordinaiy risks to the environment and public health. Even if all reasonable measures are taken to prevent the release of a contagious pathogen, it is inevitable that some amount of residual risk will remain if those measures fail. The Final EIR is intended to identify the risks of a failure, analyze them, and evaluate ways to mitigate them. This Court finds that no EIR regarding this Biolab project can rationally be found to comply adequately with MEPA that failed to consider any “worst case” scenario that involved the risk of contagion arising from the accidental or malevolent release of a contagious pathogen, and that failed to analyze whether that “worst case” scenario would be materially less catastrophic if the Biolab were located in a feasible alternative location in a less densely populated area.
I emphasize that this decision should not be misunderstood to indicate that this Court believes that the Biolab Project should not proceed, or that it may not safely be located in the BioSquare Research Park in the South End, or that it would be safer if located in a suburban or rural setting. Those questions are not for this Court to answer, and properly rest in. the province of the governmental agencies whose permits and financing are needed for this Project to proceed. All that this decision means is that, by any rational standard, in making decisions about this Biolab Project, these agencies should have the benefit of an EIR that evaluates the full extent of the potential environmental impact of the Project and considers whether that impact would be different at a feasible alternative site.
In sum, this Court finds that the Secretaiy’s certification that the Final EIR adequately and properly complied with MEPA and its regulations was arbitrary and capricious, vacates the Secretaiy’s certification of the Final EIR, and remands the matter to the Secretary for further administrative action in light of this decision. Since the Section 61 findings issued by DCAM and the BRA were based, at least in part, on an inadequate Final EIR, those Section 61 findings are also vacated and any agency action premised on the issuance of those findings is hereby stayed until an adequate Supplemental Final EIR is issued and new Section 61 findings are rendered.[10]
ORDER
After hearing, for the reasons stated above, this Court FINDS that the Secretaiy’s certification on November 15, 2004 that the Final EIR adequately and properly complied with MEPA and its regulations was arbitrary and capricious. Therefore, this Court ORDERS that:
*336 1. the Secretary’s certification of the Final EIR is hereby vacated;
2. the matter is remanded to the Secretary for further administrative action in light of this decision; and
3. since the Section 61 findings issued by DCAM and the BRA were based, at least in part, on an inadequate Final EIR, those Section 61 findings are also vacated and any agency action premised on the issuance of those findings is hereby stayed until an adequate Supplemental Final EIR is issued and new Section 61 findings are rendered.

There are three administrative records in this case, one prepared by EOEA, a second by the BRA, and a third by the state Division of Capital Asset Management (“DCAM”). Most references to the record will be that prepared by the EOEA so, for future references, this Court will identify the EOEA’s administrative record as “AR” and the others as “BRAAR” and “DCAM AR.”

G.L.c. 30, §61 specifically provides, “Damage to the environment shall not be construed to include any insignificant damage to or impairment of such resources.”

The MEPA regulations clarify that an agency “shall not be considered to include a Federal, municipal, or regional agency, department, board, commission or authority, unless it is (1) a municipal redevelopment agency created or acting in accordance with M.G.L.c. 121A or c. 121B; or (2) any other authority of any political subdivision of the Commonwealth that is created or acting specifically as an authority in accordance with applicable statutes.” 301 CMR 11.02(2)(b). Under the statutory definition and regulatory clarification, the BRA is an agency under MEPA.

The MEPA regulations define “financial assistance” rather broadly as “(a]ny direct or indirect financial aid to any Person provided by any agency,” except for any pass-through of federal funds. 301 CMR 11.02.

The Secretary, in a troubling lack of candor, muddied this point in her certification of the Draft EIR when she wrote, “The Draft EIR does not include a detailed discussion of the potential environmental impacts of the biocontainment building.” AR at 22 (emphasis added). In fact, the Draft EIR does not include any discussion of the potential environmental impacts.

Tularemia, also known as “rabbit fever,” is a bacterial disease that can affect both animals and humans, and is transmitted primarily through exposure to droplets from a rabbit or a rodent. AR at 73-1385; Superseding Supplemental ARat 5.

This Court recognizes that the Secretary found that University Associates had not knowingly or inadvertently concealed a material fact or submitted false information during the MEPA review, see Superseding Supplemental AR at 13, and did not find it necessary to require a Notice of Project Change after she learned of it. Id. This Court also recognizes that Judge Burnes, in her September 14, 2005 Decision, found that the plaintiffs had no jurisdiction to challenge the Secretary’s failure to accept public comment on the accidental tularemia exposure and that they had obtained the only relief they sought, which was that the Secretary consider the tularemia incident. This Court does not revisit Judge Burnes’ findings on these issues.

University Associates has argued that the risk of communicable disease does not constitute “Damage to the Environment,” as defined in G.L.c. 30, §61, but rather poses a public health risk that falls outside MEPA. The logical consequence of this argument is that, even if the Project were to pose a substantial risk of triggering a smallpox epidemic that would kill hundreds of thousands of residents in the Boston metropolitan area, that risk would not need to be identified and discussed in the Final EIR. The risk that the Project would increase traffic congestion or damage historic landmarks in the South End would need to be addressed in the Final EIR, but not this risk of a profound catastrophe. The Secretary does not join in this narrow statutory interpretation; nor does this Court. The Legislature chose to give the term, “Damage to the Environment,” a broad and indefinite scope, including “any destruction, damage or impairment, actual or probable, to any of the natural resources of the commonwealth.” G.L.c. 30, §61 (emphasis added). When the Legislative gave examples in the statute of what would constitute “Damage to the Environment,” it made clear that it did not intend to exclude examples it failed to list. Id. (“shall include but not be limited to air pollution” et at.). This Court finds that the transmission of contagious pathogens be deemed a type of air pollution. In any event, the most precious of the “natural resources of the commonwealth” is the health of its citizens, and anything which poses a significant risk of collectively damaging or impairing that precious resource falls within the scope of MEPA. Moreover, a statute is not to be given an interpretation that would override common sense, or produce absurd or unreasonable results, and the interpretation proposed by University Associates would do just that. See Dillon v. Massachusetts Bay Transportation Authority, 49 Mass.App.Ct. 309, 315-16 (2000).

The plaintiffs also complain that the Final EIR was deficient for failing to consider alternative locations further removed from what they refer to as an “environmental justice” population, which appears to be essentially a euphemism for a population that is poor or working class and largely minority. This Court is cognizant of the complaints of poor and minority communities that governments tend to place in their communities the projects that wealthier communities do not want, perhaps because wealthier communities possess greater political clout or know better how to delay and burden these projects. This issue of fairness is not a sufficient basis for the Secretary to direct a proponent to consider alternative sites, because alternative sites should be considered only if they may have a different environmental impact than the proposed site. However, the environmental impact of this Project on a poorer community may be different from that of a wealthier community of similar density, because, for instance, if there is a need to act quickly to evacuate an area or impose a quarantine, the poor may be less able to evacuate (since fewer have access to vehicles) and less easy to quarantine (since fewer have access to personal computers that may allow them to obtain public safety information via the Internet). Differences in environmental impact among alternative sites, caused in part by the economic differences among communities, is fair game for an EIR.

Ihis Court understands that NIH has prepared an EIR regarding the Project under the National Environmental Protection Act. Since the NIH Report is not part of the administrative record in this case, this Court does not know whether NIH has adequately addressed any of the issues that were inadequately addressed in the Final EIR. The content of that NIH EIR may not influence this decision because the NIH EIR was issued after the Secretary’s certification of the Final EIR and all parties acknowledge that the Secretary may not properly delegate her responsibility to ensure an adequate Final EIR to any federal agency. Nor may she certify an inadequate Final EIR based on her expectation that the issues inadequately analyzed will later be adequately analyzed in a federal EIR. This Court expressly does not decide whether the inclusion of the NIH EIR in any Supplemental Final EIR prepared by University Associates will be sufficient by itself to warrant the Secretary’s certification of the Supplemental Final EIR